# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

THE UNITED STATES OF AMERICA )
ex rel. Kathryn Meyer )
                         )
        **Plaintiffs,** )
                         )
**v.** )
                         )
**DR. RAYMOND RIZZI, DPM,** )    **CIVIL ACTION CASE NO.**
                         )
**ENCOMPASS MEDICAL GROUP, PA,** )
                         )
**ADVANCED WOUND CARE CENTER,** )    *FILED IN CAMERA*
                         )    *and UNDER SEAL*
**CENTERPOINT MEDICAL CENTER,** )
                         )
**HCA MIDWEST HEALTH**, )
                         )    **FALSE CLAIMS ACT COMPLAINT**
**and** )
                         )
**HOSPITAL CORPORATION OF** )
**AMERICA,** )
                         )
        **Defendants** )
_____ )

## INTRODUCTORY STATEMENT

The Plaintiff, The United States of America ex rel. Kathryn Meyer (hereinafter "Plaintiff"), by and through her counsel of record, brings this action on behalf of the United States of America, and on her own behalf, against Raymond Rizzi, DPM (hereinafter "Rizzi"); Encompass Medical Group, PA (hereinafter "Encompass"); Advanced Wound Care Center (hereinafter "AWCC"); Centerpoint Medical Center (hereinafter "Centerpoint"), HCA Midwest Health (hereinafter "HCA Midwest"); and Hospital Corporation of America (hereinafter "HCA") pursuant to the Qui Tam provisions of the Federal False Claims Act, 31 U.S.C. §§3729-33

("Federal FCA" or "FCA") (referred to herein as "Qui Tam Action"). Pursuant to 31 U.S.C. §3730(b)(2), this action is brought *in camera* and under seal.

Plaintiff alleges that Defendants have violated the Federal FCA, by submitting or causing to be submitted false claims for reimbursement from Medicare and Medicaid, and by making false certifications upon which payments from the Federal government were based

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §§3732(a) and 3730.

2.      Venue is appropriate as the Defendants can be found in, reside in, and/or transact business in this judicial district. Therefore, within the meaning of 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a), venue is proper.

3.      To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. 3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information on which these allegations are based.

## THE PARTIES

4.      Plaintiff Kathryn Meyer is a citizen of the United States of America and a resident of Missouri. Plaintiff brings this action based upon direct and unique information obtained during the period of her employment with or around Defendants. As characterized by the Federal False Claims Act, Plaintiff will often be referred to as "Relator" hereafter. Relator has provided some of this information to the United States through a Relator's "Disclosure Statement" served on the United States.

2

5.      Relator was employed by Healogics at the AWCC from 2011 until February 2017. She was employed first as the clinical manager and later as the Director of the AWCC. Relator reported to managers at both Healogics and HCA Midwest Health.

6.      The AWCC operates under a contract with Healogics, Inc. Healogics is a wound care management company that provides wound care and consulting services to nearly 800 hospitals across the United States.

7.      Defendant Rizzi is Dr. Raymond Rizzi, DPM. Defendant Rizzi is a podiatrist who is associated with the Encompass Medical Group, PA, and who works at Defendant AWCC in Independence, Missouri, which is an outpatient clinic that specializes in treating patients with chronic, slow or non-healing wounds.

8.      Defendant AWCC specializes in surgical debridement, topical dressings, compression therapy, negative pressure therapy, biological skin substitutes and hyperbaric oxygen therapy. The AWCC has surgical specialties in  skin grafting and flaps and deep debridement. It utilizes hyperbaric oxygen therapy ("HBOT") for chronic wounds in appropriate patients.

9.      Defendant Rizzi also works at Centerpoint Ambulatory Surgery Center in Independence, Missouri, which is part of HCA Midwest Health.

10.     Defendant Rizzi also has hospital privileges and performs surgeries and procedures for which Medicare and Medicaid are billed at Centerpoint Medical Center in Independence, Missouri; at Lee's Summit Medical Center in Lee's Summit, Missouri; and at Overland Park Regional Medical Center in Overland Park, Kansas, all of which are owned by Defendant HCA Midwest Health.

11.     Centerpoint Medical Center, Lee's Summit Medical Center and Overland Park Regional Medical Center are each among the nine hospitals comprising Defendant HCA Midwest Health.HCA Midwest Health is owned by, and is a division of, Defendant HCA, which is headquartered in Nashville, Tennessee.

12.     Defendant Rizzi is associated with Defendant Encompass Medical Group, PA, which has medical offices in the Kansas City Metropolitan area, including in Jackson County, Missouri.

13.     On information and belief, all actions, omissions, claims, and representations made by Rizzi, as alleged herein, were taken and/or made on behalf of Rizzi and on behalf of Encompass Medical Group, PA.

14.     Each of the defendants contracts with Medicaid, Medicare, and other government budgets and private insurance to provide healthcare services to patients.

## THE FEDERAL-STATE MEDICAID PROGRAM

14.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. 1396-1396v (hereinafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States (and territories) and is funded by State and Federal taxpayer revenue. In Missouri, Medicaid funding remained roughly 40% state-funded and 60% federally-funded throughout the relevant time periods herein. The Medicaid Program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services (hereinafter "CMS"). Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needing individuals who qualify for Medicaid.

4

## THE FEDERAL MEDICARE PROGRAM

15.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. 1395-1395ccc, (hereinafter "Medicare"), is a Health Insurance Program administered by the Government of the United States and is funded solely by Federal taxpayer revenue. The Medicare Program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services (hereinafter "CMS"). Medicare provides funding for healthcare services and supplies for individuals age 65 and older, those with end stage renal failure, and for individuals with certain permanent disabilities. Medicare Part B provides funding for hospital care for all such individuals.

## FEDERAL FALSE CLAIMS ACT

16.     The Federal False Claims Act, 31 U.S.C. 3729(a)(1)(A) makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment, a violation of federal law.

17.     The Federal FCA, 31 U.S.C. 3729(a)(1)(B) makes "knowingly" making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim, in order to get a false or fraudulent claim paid or approved by the Government, a violation of federal law.

18.     The Federal FCA, 31 U.S.C. 3729(a)(1)(C) makes conspiring to commit any of the above acts under the Federal False Claims Act, a violation of federal law.

19.     The Federal FCA, in 31 U.S.C. 3729(b)(1), defines "knowing" as that a person, with respect to information, 1) has actual knowledge of the information, 2) acts in deliberate ignorance of the truth or falsity of the information, or 3) acts in reckless disregard of the truth or falsity of the information, and requires no specific intent to defraud.

5

20.     The Federal FCA, in 31 U.S.C. 3729(b)(2), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property, whether or not the United States has title to the money or property, which is presented to an officer, employee or agent of the United States; or which is made to a contractor, grantee, or other recipient (including a state or local governmental agency), if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, *and if the United States Government provides or has provided any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or properly which is requested or demanded.*

## MISSOURI HEALTH CARE PAYMENT FRAUD AND ABUSE ACT

21.     The Missouri Health Care Payment and Abuse Act set forth in sections 191.900 to 191.910 of the Missouri Revised Statutes makes the same conduct that is unlawful under the Federal False Claims Act unlawful when Missouri Medicaid funds are involved.

## FEDERAL REGULATIONS SETTING STANDARDS FOR INFORMED CONSENT

22.     The Code of Federal Regulations sets forth standards required for informed consent of patients as follows:

### 42 CFR 482.13 - Condition of participation: Patient's rights.

A hospital must protect and promote each patient's rights.

(a) Standard: Notice of rights - (1) A hospital must inform each patient, or when appropriate, the patient's representative (as allowed under State law), of the patient's rights, in advance of furnishing or discontinuing patient care whenever possible.

(2) The hospital must establish a process for prompt resolution of patient grievances and must inform each patient whom to contact to file a grievance. The hospital's governing body must approve and be responsible for the effective operation of the grievance process and must review and resolve grievances, unless it delegates the responsibility in writing to a grievance committee. The grievance

6

process must include a mechanism for timely referral of patient concerns regarding quality of care or premature discharge to the appropriate Utilization and Quality Control Quality Improvement Organization. At a minimum:

(i) The hospital must establish a clearly explained procedure for the submission of a patient's written or verbal grievance to the hospital.

(ii) The grievance process must specify time frames for review of the grievance and the provision of a response.

(iii) In its resolution of the grievance, the hospital must provide the patient with written notice of its decision that contains the name of the hospital contact person, the steps taken on behalf of the patient to investigate the grievance, the results of the grievance process, and the date of completion.

(b)Standard: Exercise of rights.

(1) The patient has the right to participate in the development and implementation of his or her plan of care.

(2) The patient or his or her representative (as allowed under State law) has the right to make informed decisions regarding his or her care. The patient's rights include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment. This right must not be construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate.

(3) The patient has the right to formulate advance directives and to have hospital staff and practitioners who provide care in the hospital comply with these directives, in accordance with § 489.100 of this part (Definition), § 489.102 of this part (Requirements for providers), and § 489.104 of this part (Effective dates).

(4) The patient has the right to have a family member or representative of his or her choice and his or her own physician notified promptly of his or her admission to the hospital.

(c)Standard: Privacy and safety.

(1) The patient has the right to personal privacy.

(2) The patient has the right to receive care in a safe setting.

(3) The patient has the right to be free from all forms of abuse or harassment.

7

# FEDERAL REGULATIONS SETTING STANDARDS FOR SURGICAL SERVICES

23.     The Code of Federal Regulations sets forth standards required for hospital

surgical services and also outpatient surgical services as follows:

## § 482.51 Condition of participation: Surgical services.

If the hospital provides surgical services, the services must be well organized and provided in accordance with acceptable standards of practice. If outpatient surgical services are offered the services must be consistent in quality with inpatient care in accordance with the complexity of services offered.

**(a)** *Standard: Organization and staffing.* The organization of the surgical services must be appropriate to the scope of the services offered.

**(1)** The operating rooms must be supervised by an experienced registered nurse or a doctor of medicine or osteopathy.

**(2)** Licensed practical nurses (LPNs) and surgical technologists (operating room technicians) may serve as "scrub nurses" under the supervision of a registered nurse.

**(3)** Qualified registered nurses may perform circulating duties in the operating room. In accordance with applicable State laws and approved medical staff policies and procedures, LPNs and surgical technologists may assist in circulatory duties under the surpervision of a qualified registered nurse who is immediately available to respond to emergencies.

**(4)** Surgical privileges must be delineated for all practitioners performing surgery in accordance with the competencies of each practitioner. The surgical service must maintain a roster of practitioners specifying the surgical privileges of each practitioner.

**(b)** *Standard: Delivery of service.* Surgical services must be consistent with needs and resources. Policies governing surgical care must be designed to assure the achievement and maintenance of high standards of medical practice and patient care.

**(1)** Prior to surgery or a procedure requiring anesthesia services and except in the case of emergencies:

**(i)** A medical history and physical examination must be completed and documented no more than 30 days before or 24 hours after admission or registration.

**(ii)** An updated examination of the patient, including any changes in the patient's condition, must be completed and documented within 24 hours after admission or registration when the medical history and physical examination are completed within 30 days before admission or registration.

8

**(2) A properly executed informed consent form for the operation must be in the patient's chart before surgery**, except in emergencies.

**(3)** The following equipment must be available to the operating room suites: call-in-system, cardiac monitor, resuscitator, defibrillator, aspirator, and tracheotomy set.

**(4)** There must be adequate provisions for immediate post-operative care.

**(5)** The operating room register must be complete and up-to-date.

**(6)** An operative report describing techniques, findings, and tissues removed or altered must be written or dictated immediately following surgery and signed by the surgeon.

[ 51 FR 22042, June 17, 1986, as amended at 72 FR 66933, Nov. 27, 2007]

## CMS' HOSPITAL INTERPRETIVE GUIDELINES FOR INFORMED CONSENT

24. The Centers for Medicare and Medicaid Services ("CMS") periodically issues interpretive guidelines for State Survey Agency Directors to follow in audits and reviews to ensure Medicare providers are in compliance with applicable regulations.

25. In April 2007, CMS issued revised guidelines for informed consent with respect to 42 CFR 482.13(b)(2) "Patient's Rights" and 42 CFR 482.51(b)(2). These guidelines, to ensure compliance with these regulations require surveyors to ensure that hospitals have policies that address the patient's right to make informed decisions, how the hospital assures patients' ability to exercise this right, how the patient will be involved in his/her care planning & treatment, the right to refuse treatment, etc.

26. With regard to surgical services and informed consent, the guidelines state:

> The primary purpose of the informed consent process for surgical services is to ensure that the patient, or the patient's representative, is provided information necessary to enable him/her to evaluate a proposed surgery before agreeing to the surgery. Typically, this information would include potential short- and longer- term risks and benefits to the patient for the proposed intervention, including the likelihood of each, based on the available clinical evidence as informed by the responsible practitioner's professional judgment. Informed consent must be obtained, and the informed consent from must be placed in the patient's medical record, prior to surgery, except in the case of emergency surgery. . .

9

Hospitals must assure that the practitioner(s) responsible for the surgery obtain informed consent from patients in a manner consistent with the hospital's policies governing the informed consent process.
(See CMS Form Ref: S&C-07-17)

**RELEVANT HCA HOSPITAL POLICIES REQUIRED BY CENTERS FOR MEDICARE & MEDICAID SERVICES' HOSPITAL INTERPRETIVE GUIDELINES FOR INFORMED CONSENT**

27.     HCA has adopted policies with respect to Patient Bill of Rights, as follows:

**The Patient Bill of Rights: Your Right to Respect and Good Care
The Right to Make Decisions**

You must be given all the information you need to make decisions about your healthcare. No one else can make those decisions for you—except under the following conditions:

- If you are unable to make decisions (due to physical or mental health reasons) and you have legally handed over that right to a designated family member or friend (health care proxy)
- If you are the responsibility of a person assigned to you by a court

Doctors and other healthcare professionals may recommend a particular course of action, but you must be informed of all other options and be given the opportunity to carefully consider those options before proceeding.

You have the right to refuse treatment.

**MEDICARE PROVIDER ENROLLMENT AGREEMENT**

28.     The Medicare Enrollment Agreement Providers are required to sign in order to be eligible to receive Medicare payments, specifically certifies in the "Certification Statement:"

I agree to abide by the Medicare laws, regulations and program instructions that apply to me . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions . . . (CMS Enrollment Agreement, CMS Form 855i, pg. 25)

10

## MEDICARE PROGRAM INSTRUCTIONS

29.     Under Medicare rules, it is axiomatic that physicians, including podiatrists, cannot bill for procedures that are not supported by documentation, and this is known by each of the defendants. *See, e.g.* Medicare Benefit Policy Manual and CMS Fact Sheets.

30.     The HHS/CMS November 2017 publication entitled "Avoiding Medicare Fraud & Abuse: A Physician's Road Map" states: "The Medicare Program may review beneficiaries' medical records. Good documentation helps address any challenges raised about the integrity of your claims. You may have heard the saying regarding malpractice litigation: "If you didn't document it, it's the same as if you didn't do it." The same can be said for Medicare billing." (p. 8).

31.     According to section 1862(a)(1)(A) of the Social Security Act, Medicare will not cover services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

32.     42 CFR 482.24(c) requires medical records to be accurate and complete.

## FACTS AND ALLEGATIONS

33.     The Relator in this case is Kathryn Meyer, BSN, DCM.

34.     Relator is a former employee of Healogics, Inc., formerly known as Accelecare Wound Centers, Inc. in Kansas City, Missouri.

35.     Healogics is a wound care management company that provides wound care and consulting services to nearly 800 hospitals across the United States.

36.     Healogics supplied employees to provide services to Defendant Centerpoint Medical Center and the Advanced Wound Care Center pursuant to a contract.

11

37.     Relator was an employee of Healogics who provided services to Defendants Advanced Wound Care Center and HCA Midwest under the contract.

38.     Relator began work at Defendant AWCC in 2011. She started out as a Clinical Nurse Manager and in January 2013, Relator became the Director of the Wound Care Center.

39.     In her position, she was involved in virtually all aspects of the practice, both clinical and administrative.

40.     And, in her position, she reported to managers at both Healogics and at Defendant HCA Midwest Health, which operates Defendant Centerpoint Medical Center and Defendant AWCC.

41.      Defendant Rizzi previously had hospital privileges at North Kansas City Hospital, but he was stripped of those privileges.

42.     In order to be eligible to bill Medicare a physician or other provider must first submit a signed Medicare Provider Enrollment form. This form certifies that the provider will not submit to Medicare false claims for payment. And the form makes clear that the failure to comply with the enrollment agreement will subject the provider to liability under the False Claims Act. (See CMS Enrollment Agreement, CMS Form 855i, pg. 23-25.)

43.     The provider then subsequently each year signs a Medicare Provider Agreement which recertify compliance with all of the conditions and requirements to which the provider certified compliance in his or her enrollment agreement.

44.     Rizzi and, on information and belief, Encompass, AWCC, Centerpoint, HCA Midwest, and HCA, have been in knowing violation of the requirements of those agreements each year since at least 2012 by knowingly and regularly submitting materially false claims to Medicare for payment in each of the ways set forth in this Complaint.

12

45.     Each defendant's annual certification to Medicare each year since at least 2011 was therefore a knowingly false express certification to make or cause the Government to find him/them eligible to receive payments from Medicare in violation of 31 U.S.C. 3729(a)(1)(B), with each such certification constituting a false claims act violation.

46.     Because each of the defendants was deemed eligible to receive payments from Medicare only through falsely certifying compliance with a material term of his/its provider agreement, specifically that he/it would not submit knowingly false claims to Medicare for payment, every claim submitted to Medicare for payment when he/it was deemed eligible for payment based upon this false certification of compliance constitutes a false claims act violation under 31 U.S.C. 3729(a)(1)(A).

47.     Each of the defendants has been in knowing violation of the requirements of those agreements each year since at least 2011 by knowingly and regularly submitting false claims to Medicare for payment in each of the ways set forth in this complaint. And, as such, each claim submitted to Medicare for payment since at least 2012 constitutes a false claim.

48.     Defendant AWCC is an outpatient clinic that specializes in treating patients with chronic, slow or non-healing wounds, particularly diabetic patients suffering neuropathy and foot sores.

49.     When Relator was the Clinical Nurse Manager, she questioned Dr. Rizzi's practices as she was directly assigned to assist him with his practice. Some of his practices included Dr. Rizzi's failure to tell patients about procedures and treatment options instead of surgery. This violated the patient bill of rights.

50.     As the Clinical Nurse Manager, Relator also observed that Dr. Rizzi was performing unnecessary Total Contact Casting (TCC) at least twice a week instead of only once

per week per the manufacturer's guidelines; that Dr. Rizzi was using Biological Skin Substitutes (BSS) on patients that were not clinically indicated; and that no other doctor in the wound center was doing these practices.

51.     In January 2013, when Relator became the Director of the AWCC, she began to see billing and charges for the clinic, the hospital and also the doctors.

52.     As more fully detailed below, Relator observed Dr. Rizzi neglecting patients, denying them services that they might be eligible for, and not informing patients of all services that could be used for treatment (in violation of their patient rights). Instead, Dr. Rizzi performed surgery multiple times, delayed diagnoses for patients until after the resulting pathology report for amputations, and did not perform biopsies or cultures in many cases or have MRI's for patients prior to surgery. By not having these tests performed, Rizzi denied patients lifelong healing treatments such as HBO therapy instead of non-reversible, lifelong complicated amputations. As a result, hundreds of patients have had unnecessary and harmful amputations that lead to lifelong expenses, increased medical complications, and even death in some case.

53.     In March 2016, Relator learned that a patient, RG, left the wound care clinic stating he would never come back after Dr. Rizzi suggested that RG get a below the knee amputation of his paralyzed leg. RG had failed to heal over the course of 8 months of treatment with Rizzi which included many weekly applications and some twice weekly applications of TCCs.

54.     Two months later, Relator learned that RG had been billed for services that had not been performed. Relator then contacted hospital Director Gabe Clements and informed the AWCC Medical Director, Dr. Carter, who instructed Relator to follow up and tell the patient to

14

contact hospital billing, but otherwise they could not help because they did not have anything to do with physician billing.

55.     On September 26, 2016, Relator learned that certain charges did not match up for patient DG who Dr. Rizzi had treated the week before.  During an exam of DG, Dr. Rizzi used gauze to wipe some of the black eschar off the toes.  An instrument was not used and the clinical manager did not mark anything on the Superbill except an E/M level because no debridement was performed or noted by Dr. Rizzi.  Dr. Rizzi was adamant that he performed a subQ debridement and explained he was not changing his dictation. Relator validated with the patient that the subQ debridement was not performed.

56.     Relator initiated the removal of the charges from the hospital account for Patient DG, and she explained to Mr. Clements that he needed to instruct Dr. Rizzi to change his dictation. However, Dr. Rizzi was never made to change the dictation, the hospital added the charge back to the hospital bill and the patient was billed for a procedure that never occurred.

57.      Relator reported this incident involving patient DG to Ethics and Compliance at Healogics, as well as to Mr. Clements at HCA.

58.     Then, in October 2016, Dr. Rizzi again charged a patient for a subQ debridement procedure that had not occurred for Patient SG.  The subQ debridement was dictated by Rizzi, charted and charged for, but this time Rizzi had used a Q-tip.

59.     Relator again notified Gabe Clements at HCA. Mr. Clements instructed Relator not to remove the charges, not to contact Ethics and Compliance, and that he would "take care of everything" this time.  In the end, the hospital charges were never removed, and the incident was not reported to HCA Ethics and Compliance.

60.     On October 28, 2016, Relator reported thirteen of Rizzi's patient accounts with discrepancies, specifically for patients MS, SB, SP, SG, SC, JA, DG, WB, MP, DD, TB, RV and TK.

61.     In January 2017, patient AL was amputated by Dr. Rizzi without consent. There is no dictation supporting discussion of amputation or a consent form for this procedure. This patient only consented to a debridement. The preoperative dictation by Dr. Rizzi only discussed a debridement, nothing of amputation. Relator reported this incident on an incident report with the hospital. When the patient contacted the AWCC to discuss the situation, Relator informed her HCA supervisor Gabe Clements. Mr. Clements instructed the Relator to direct the patient back to Dr. Rizzi only and not to hospital compliance.

62.     In January 2017, Relator received two patient complaints about the bills they had received from Dr. Rizzi. The bills were incorrect and had procedures that had not been performed including a TCC and an amputation.

63.     During the course of her employment as the Director at the AWCC, Relator learned that Dr. Rizzi was billing for services that he did not provide; that Rizzi was billing for services incorrectly and duplicating services provided by the AWCC or the hospital; that Rizzi was not following the 90-day global rules after surgeries; that Rizzi was casting patients unnecessarily and excessively in order to bill for these services; that Rizzi was billing for casting services, unna boots, 3 layer wraps, and skin substitutes, when the only service he actually performed was a BSS (Biological Skin Substitutes); and that Rizzi was not following the CCI edits which are given by Medicare.

64.     Relator also contacted HCA officials to report Dr. Rizzi performing what appeared to be excessive or medically unnecessary procedures, performing unnecessary

amputation surgical procedures, lying to patients to get them to consent to more treatments that would be billed to Medicare, and not correctly recording what transpired in an exam or surgical procedure.

65.     Every quarter the Relator would train nurses how to charge physician and facility services.  Dr. Rizzi continued to fill out the part on the superbill that he was not supposed to, which the nurses labeled "Rizzi's mark."  The nursing staff at the AWCC would try to mark out the Dr. Rizzi marks, but it appears from his bills that he billed for services that had been marked out.

66.     HCA sends a copy of the superbills to physicians.  The superbills would go to Dr. Rizzi's office which is his home address as well as Jorge Zavala in Corinth, Texas. Dr. Rizzi billed his patients through Jorge Zavala in Corinth, Texas. Dr. Rizzi billed for services he did not provide through Mr. Zavala.

67.     In the fall of 2016, Relator suggested a patient of Rizzi get a second opinion rather than undergoing the amputation Rizzi had ordered. The patient's wounds were later completely healed through Hyperbaric Oxygen Therapy ("HBOT"), and he did not have to undergo amputation.

68.     This infuriated Defendant Rizzi who raised non-credible allegations of STARK law violations against Relator who had made no specific referral for the patient to act on and who had no ownership or financial interest in the clinic where the patient ultimately received care. Relator had merely suggested the patient get a second opinion, knowing that HBOT had been successful on other patients with the same condition without the trauma, risks, or permanence of amputation.

69.     On December 27, 2016, Relator's Healogics supervisor, Carrie Clark, and Gabe Clements, who was Relator's HCA supervisor, had a private meeting with Relator and explained that Dr. Rizzi had filed a complaint with HCA's Ethics and Compliance and that Relator might be fired because of a possible STARK law violation. Relator explained that she thought Dr. Rizzi's action to file a complaint against her was retaliation for her reporting Dr. Rizzi. Mr. Clements suggested "as a friend" that Relator look for another job.

70.     A few months earlier, Relator had emailed Phil Butell, the COO of the hospital and Chair of Ethics and Compliance at the hospital because she was concerned about a possible Stark Law violation with AWCC doctors referring patients from their own private practices to themselves at the AWCC.

71.     In response to this retaliation and bogus STARK law allegation, Relator resigned in February 2017 and sought employment elsewhere.

### Billing for Medically Unnecessary Services or Worthless Surgery

72.     Rizzi regularly performed total casting (TCC) on the same patient weekly. Rather than leaving the cast on for the required duration, he improperly billed Medicaid and Medicare more by removing the cast and applying a new one every week.

73.     This was typically done at the wound care center (AWCC). And it was typically performed by nurses at Rizzi's direction. And because it was performed by nurses, only the facility is legally allowed to bill for this service. But Rizzi would bill for the procedure as though he had performed it, and could therefore bill the government for his services.

74.     Replacing these casts weekly was medically unnecessary, and was done regularly to numerous patients. Many of those patients were either Medicaid or Medicare patients. And it

is a violation of the False Claims Act to bill Medicaid/Medicare for medically unnecessary or worthless services.

75.     Patient RG, a Medicare patient, was casted repeatedly for numerous months from July 2015 through March 2016, although it was not medically indicated because the patient was not healing. Rizzi still continued to cast the patient and also charge for the casting procedures which he did not perform. Rizzi billed Medicare and was paid for these services.

76.     Upon information and belief, Rizzi has continued to bill for TCC procedures that the AWCC also bills for as the AWCC is providing that service to patients.

77.     Rizzi refused to order cultures for antibiotic therapy and failed to diagnose patients as Wagner Grade 3 so as to avoid alternative treatments like Hyperbaric Oxygen (HBO) therapy that could be used to heal the patients.

78.     Instead, Rizzi chose to take these patients to the Operating Room to amputate the infected bone as the only paying option.

79.     Rizzi took patients to surgery for procedures that were not needed and also took extreme measures, such as repeated amputations, instead of proper procedures designed to heal patients such as debridements, cultures with antibiotic therapy, or HBO therapy.

80.     Rizzi routinely failed to tell patients about all the possible treatments available, which is a patient's right as recognized by Defendant HCA.

81.     On July 19, 2013, Relator raised concerns of staff and physicians concerning Rizzi and his high amputation rate.

82.     On or about May 23, 2014, Patient NS had her fifth metatarsal amputated by Rizzi, despite the fact that NS did not consent to amputation and only consented to a sharp debridement. Her fifth metatarsal did not have an infection.

19

83. On or about November 21, 2012, December 17, 2012, January 29, 2013, February 19, 2013, March 27, 2013, and April 22, 2013, Patient, WR, was amputated multiple times. in the midst of these amputations, a vascular doctor believed to be Dr. Waldschmidt,  convinced WR to use HBO therapy instead. WR began to heal with HBO therapy, and then Rizzi told the patient to stop the treatments. WR then needed further amputation.

84. Upon information an belief, WR was a Medicare patient.

85. Relator reported her concerns about Rizzi's excessive amputations to Dr. Sullivan, the Chief Medical Officer for Centerpoint on or about April 29, 2013.  In January 2017, Patient KS was diagnosed with Wagner grade 3 and underwent worthless Charcot foot reconstruction while infected and with osteomyelitis.

86. Rizzi did not offer the option of HBO therapy to KS and the patient ended up ultimately having to have a below-the-knee amputation (BKA).

87. Rizzi has repeatedly dictated that Charcot reconstruction surgery is useless. But Rizzi still performed this high risk surgery, which failed, rather than trying HBO therapy, resulting in the patient's entire lower leg having to be amputated.

88. Upon information and belief, KS is a Medicaid patient.

89. Patient WA was inappropriately casted contrary to manufacturer guidelines, which require proper testing.

90. This inappropriate casting resulted in multiple amputations and an eventual total amputation (TMA).

91. Instead of following clinical practice guidelines, Rizzi performed surgeries that were not beneficial to the patient and resulted in multiple amputations. Rizzi has had a pattern of a high number of amputations compared to similar surgeons at the AWCC.

20

92.     Standard practice in the medical field would be to use less expensive, less invasive, and equally effective, non-surgical or HBO procedures rather than more dramatic, invasive and expensive surgical amputations in those circumstances. Amputations result in higher lifelong Medicare costs, increased infections, and increased mortality rates for patients.

93.      Numerous patients under Rizzi's care, including patients EM, PC, LH, MJ, and JO, were deprived of non-surgical or HBO procedures.

94.     Multiple patients were misdiagnosed, making them ineligible for alternative treatments. For example:  Patient MW suffered pressure ulcer for 153 days; Patient FS suffered pressure ulcer for 120 days; and Patient MC suffered pressure ulcer for 111 days.

95.     The Wagner diabetic foot ulcer classification system assesses ulcer depth and the presence of osteomyelitis or gangrene by using grades 0 through 5. Medicare covers HBO therapy for Wagner Grade 3 or higher. (See Medicare Coverage Database decision memo CAG-00060N).

96.     In January 2017, Patient EC, a Mediacre patient, was under-diagnosed by Rizzi with Wagner grade 2 with amputations, instead of Wagner grade 3, which is what it properly should have been. This resulted in the patient not receiving alternative healing treatment options.

97.     Patient SG, a Medicare patient, was under-diagnosed by Rizzi with Wagner grade 2, instead of Wagner grade 3. An MRI was never conducted to confirm the grade 2 diagnosis. Patient suffered fracture and wound for two years.

98.     Patient DG was not healing. A Worker's Compensation nurse had to ask Rizzi in his private office to offer HBO therapy to help the patient heal. Rizzi told the RN nurse, Mary, that it likely would not work. However, the patient was healed after completing HBO treatments.

99.     In January 2017, Patient MM had a wound that was never graded by Rizzi, even after surgery and removal of a tendon, which is a Wagner grade 3. Rizzi's failure to grade the wound made the patient ineligible for HBO services.

100.    Patient SB, a Medicare patient, presented with wounds for several years and was referred to Rizzi. In 2017, Rizzi used multiple skin substitutes in the same surgery and placed the skin substitutes on top of each other. There is no clinical foundation for this practice.

101.    Patient MP presented with pyoderma gangrenosum. Rizzi treated this patient for infection with steroids and the patient showed improvement. Rizzi then told the patient to stop the steroids, and the patient got worse.

102.    Relator provided Patient MP, a Medicaid patient, with information for a second opinion. Rizzi was notified by George West, RN, that patient went to another doctor. Rizzi then went to the hospital to complain. Healogics and HCA then advised Relator that she should look for another job.

103.    Patient MP also called the clinic and spoke with Relator to advise that he was treated for pyoderma and had healed. The patient also advised Rizzi had called his phone multiple times asking where he had gone and patient wanted to know how long Rizzi would continue to call.

104.    Patient BE had been amputated multiple times, on January 22, 2013 and after by Rizzi. Rizzi told him he would have to have a total amputation (TMA) and gave no alternatives to the patient even though the patient was requesting alternatives. At the request of the HCA nurse, Relator then spoke to the patient and suggested HBO treatment. The patient then received HBO under another doctor's care. During the HBO treatment, Rizzi reopened the patient's wound without his consent which delayed healing.

105. On January 31, 2017, 14 patients were on Dr. Rizzi's schedule. Dr. Rizzi saw 11 of the patients, 9 of whom were misdiagnosed, under diagnosed or had worthless surgery or procedures performed—an 81% inaccuracy rate.

**Billing Medicaid and Medicare for services that were not provided**

106. Defendant Rizzi has billed patients, Medicare, and Medicaid for procedures that were not actually performed.

107. Relator received complaints that patients' bills from Rizzi reflected that they had undergone procedures when they had not.

108. Relator received information from co-workers that patients had come into the office complaining about their bills, and that they were getting billed for examinations or services that did not occur during their office visits.

109. Rizzi billed MC, a Medicare patient, for services he did not provide on December 13, 2016 and again on December 20, 2016, namely "Strapping: Unna Boot" services. Only the hospital can charge for this procedure.

110. On or about Friday, October 21, 2016, Rizzi falsely documented that he had done a "subQ" debridement when he had not used any surgical instrument but instead used a Q-tip on Patient SG, a Medicare patient.

111. On October 25, 2016, Relator discussed Rizzi's inappropriate debridement and dictations concerning Patient SG with Dr. Carter and Mr. Clements.

112. The False Claims Act prohibits billing for a procedure that was not performed.

113. Rizzi billed for amputations that he did not perform. For example, with respect to Patient SC:

a.  On November 20, 2015 and December 4, 2015, Rizzi billed for the application of a cast that he did not apply.

b.  On February 7, 2016, Rizzi billed for an amputation and debridement on the same day, which is not supported by dictation in the medical record.

c.  On February 19, 2016, Rizzi billed for negative pressure wound therapy which is a service he did not perform; the nurse did.

d.  On June 24, 2016, Rizzi billed for an amputation on Patient SC that was never performed on the patient and is not confirmed in Rizzi's dictation in the medical record.

e.  On July 29, 2016, Rizzi charged for debridement and the application of a skin substitute graft, which is a double charge, and there is no documentation that these services were performed.

f.  On August 5, 2016, Rizzi again charged for debridement and the application of a skin substitute graft, which is a double charge, and there is no documentation that these services were performed.

114.  Billing Medicare for services to SC that never occurred is a false claims act violation under 31 U.S.C. 3729(a)(1)(A).

115.  AWCC staff informed Relator that Rizzi was incorrectly marking the Superbill and charging for procedures that were incorrect.  For example, in September 2016, Rizzi's mark was on the Superbill, and Rizzi added charges on the Superbill for a Sub Q debridement that he did not perform on Patient DG.

116.  On September 26, 2016, Relator learned from her office coordinator that certain charges did not match up for a Patient DG who Dr. Rizzi had treated the week before.

24

117. During the exam, Rizzi used gauze to wipe some of the black escar off of the patient's toes. No instrument was used and the clinical manager did not mark anything on the Superbill except an E/M level visit because no debridement was performed or noted by Rizzi.

118. Rizzi was adamant that he performed a subQ debridement and explained he was not changing his dictation.

119. Relator validated and verified with the patient on a phone call that the surgical procedure was not performed.

120. Relator initiated the removal of the charges from the HCA billing system, and she explained to Defendant Centerpoint Medical Center Director, Gabe Clements, that he needed to instruct Dr. Rizzi to change his dictation.

121. Relator explained that if Rizzi did not change his dictation, HCA revenue and integrity would add the charges back to the patient's account per the dictation in a few weeks. Relator stated that the account would have to be flagged and monitored and once again Rizzi would still need to correct his dictation.

122. However, Rizzi was never made to change the dictation and the hospital added the charge back to the hospital bill, and Medicare was billed for a procedure that never occurred.

123. Billing for procedures that never occurred is a false claims act violation under 31 U.S.C. 3729(a)(1)(A).

124. Patient SG had surgery performed by Rizzi in 2016 at HCA Centerpoint. Rizzi again dictated a level of surgery that was not performed. The hospital was again notified, but Medicare was still charged.

125. Over the course of the years 2012 through 2017, Rizzi repeatedly failed to properly document the size of wounds he was treating at the AWCC, for which Medicare and

Medicaid were billed for services without proper documentation. For example, Rizzi would dictate that a wound "has exact dimensions and characteristics" or would leave spaces or blank lines in his dictation.

**Upcoding and Double Billing for Procedures**

126.    Rizzi has submitted claims since at least 2012 that are not correct and for services not provided. And Rizzi has used the wrong CPT codes for services.

127.    Rizzi has billed Medicare and Medicaid for products, including skin substitutes that he did not supply to the patients.

128.    Rizzi improperly and frequently billed for Q-code services, which he cannot legally bill for since he does not provide or purchase these products. Only HCA or Centerpoint or AWCC can charge for these products.

129.    Skin substitutes, when used, were already included as part of the total bill for the procedure and provided by the facility.  But Rizzi would then also bill for the skin substitutes separately, with the result of double billing for material that had already been paid for.

130.    On July 29, 2016, Rizzi double charged for a debridement and application of a skin graft for SC, a Medicare patient.

131.    Rizzi would also double bill for hospital services that he was not entitled to bill for.

132.    For example, Rizzi would bill for application of a cast when, according to the Superbill, these are only services that a hospital or facility can charge for, not a physician, unless the doctor himself performs the procedure. But Rizzi did not perform these procedures when done in the AWCC.

133.     Rizzi also improperly charged for both debridement and wraps or casting on the same day with other procedures and did not follow Medicare CCI edits.

134.     Patient RG was casted repeatedly for numerous months, and it was not medically indicated because the patient was not healing.

135.     But Rizzi continued to cast the patient and also to improperly charge Medicare for the casting procedures in the AWCC, which nurses performed and not Rizzi.

136.     Rizzi also billed for Q code of the skin substitute (BSS) for this patient which only the hospital is allowed to bill for since they purchased the product and had billed Medicare for it themselves.

137.     Patient SB presented with wounds for several years and was referred to Rizzi in 2016. Rizzi used multiple skin substitutes in the same surgery and placed the skin substitutes on top of each other. There is no clinical foundation for this practice.

138.     As stated above, Rizzi performed surgery on patients DG, SG and most likely others, and then dictated a different level of surgery than that which was actually performed. HCA and Centerpoint were notified but the patient was still charged for a procedure that did not occur.

139.     Relator discovered that Rizzi was double billing Medicare and Medicaid for procedures Rizzi performed only once.

140.     Rizzi billed Patient KP in August 2016, which she paid, and then send her an identical bill in February 2017 which did not reflect the payment.

141.     Rizzi has dictations that are so inadequate and substandard the coders cannot even get to the correct billing codes to match the hospital billing.

27

142.    Rizzi and HCA Centerpoint have also billed for services without the required documentation.

143.    The HCA coders are billing for services without proper dictation from Dr. Rizzi to support their claims for reimbursement. Instead of looking at the physician notes for coding, the coders are relying on the nursing notes.

144.    Coders are required to use the doctor's dictations. If the physician's dictations do not match the supporting nursing notes, coders are required to use the physician's documentation.

145.    On October 27, 2016, Relator emailed Regina Bays, HCA's Coding Quality Manager and provided a list that identified more than 98 patient encounters where Defendant Rizzi's dictations did not contain the debridement information for which HCA was billing.

146.    Then, on October 28, 2016, Relator sent a follow-up email to Bays identifying the specific names and accounts of 13 patients with discrepancies between Defendant Rizzi's dictations and the patient's bills. The patients included Patients MS, SB, SP, SG, SC, JA, DG, WB, MP, DD, TB, RV and TK. Relator noted in the email that there were many more accounts with discrepancies on sought guidance from Bays as to how to proceed.

147.    In December 2016, patient FS had a skin substitute applied that cost several thousand dollars. But Dr. Rizzi did not include this in his dictation for this date of service, resulting in HCA revenue and integrity removing the charges from the hospital system.

148.    The performance of this skin substitute procedure was fully documented in the nurse's notes in I-Heal, but the charges were removed from the hospital system since Dr. Rizzi's dictation did not support the procedure. Nurses were in the room at the time of the procedure and were documenting the procedure as it happened, making the nurse's documentation accurate.

28

149.     Patient DG had surgery performed by Rizzi. Rizzi dictated a level of surgery in the record that was not performed. The hospital was notified, but  Medicare was still charged.

150.     Patient SG had surgery performed by Rizzi. Rizzi again dictated a level of surgery that was not performed. The hospital again was notified, but Medicare was still charged.

151.     Patient AL was amputated without consent. There is no dictation supporting discussion of amputation or a consent form for this procedure. This patient consented only to a debridement. The preoperative dictation by Rizzi only discussed a debridement, nothing of amputation.

**Billing for procedures for which Rizzi lacked privileges, licensing or credentials**

152.      As a podiatrist, Defendant Rizzi is not licensed in the general practice of medicine, and the scope of his practice must be limited to the foot and/or ankle, and up to the knee only when involving a foot or ankle lesion.

153.     Rizzi performed services outside the scope of his practice by treating a patient for back pain.

154.     Patient AR was being treated by Rizzi for diabetic related foot care in 2012.

155.     AR was severely neuropathic and was not able to feel pain in his foot that Rizzi debrided and cast weekly. The typical lidocaine gel was not used with this patient in his weekly debridement because he had no pain or feeling in his feet.

156.     AR did, however, have an onset of back pain, and Rizzi treated AR's back pain by providing him prescriptions for the back pain, and referring the patient to the pain management clinic.

157.     AR was eventually admitted to Defendant HCA Centerpoint ICU and then died after MRSA was found in his spine and he had septic shock, which was most likely the actual cause of the back pain Rizzi had been treating.

158.     Rizzi provided services to Patient JH in 2016 and 2017, who had a wound on her right lower leg, which was outside of Rizzi's scope as a podiatrist.

**Billing for procedures provided without required informed consent**

159.      In January 2017, Patient AL was a 36-year old diabetic female Medicaid patient. Rizzi performed an amputation on her foot without her consent.

160.     There is no dictation supporting discussion of amputation or a consent for this procedure.

161.     Her informed consent form makes clear that there was no discussion of, nor consent to, amputation as part of the medical procedure she was consenting to.

162.     She consented only to a debridement. And her signed consent indicates she was told only of the risk of infection of H.I.V. from the procedure, not that the doctor would perform an amputation. The preoperative dictation by Rizzi discussed only a debridement and said nothing of amputating.

163.     Relator completed an incident report about this with the hospital.

164.     The Patient also called Kim Floyd Jones at Defendant AWCC discussing the situation. Jones brought this to the attention of Relator who then contacted HCA Centerpoint director, Gabe Clements.

165.     Mr. Clements instructed Relator to direct the patient back to Dr. Rizzi only and not hospital compliance.

166.     Federal regulations make clear in 42 CFR 482.51(b)(2) that a properly executed informed consent form must be in the patient's chart before the surgery, except in cases of emergency.

167.     AL's case was not an emergency; there was time prior to surgery to obtain an informed consent as evidenced by the existing informed consent Rizzi did obtain that made no mention of amputation.

168.     In January 2017, Rizzi performed that medical procedure on Patient AL which included an amputation to which the patient had not consented.

169.     After performing the amputation, Rizzi submitted the bill to Medicaid.

170.     Billing for procedures barred by federal regulation constitutes a false claim act violation under 31 U.S.C. 3729(a)(1)(A).

171.     HCA Centerpoint, where the amputation occurred, also submitted its bill to Medicaid for its part of this procedure, which, because knowingly false and knowingly in violation of Medicare's billing rules, constitutes a false claims act violation.

**Billing for surgical procedures performed in non-compliant settings**

172.     NS was a senior female diabetic Medicare patient who presented with an infection between the 4th and 5th toes.

173.     As part of the treatment process, on May 23, 2014, Rizzi amputated the patient's 5th toe, which was healthy, without her consent, in a non-sterile clinic exam room at the AWCC.

174.     On May 27, 2014, NS returned to the clinic with an infection, which resulted in NS having to go to be admitted to Centerpoint hospital for five days.

175.     This surgery in a non-sterile clinic exam room was in direct violation of standards and requirements set forth in 42 CFR 482.51 for outpatient surgical services.

31

176.    Relator reported this incident to HCA Wound Care Administrator, Kyla Stoltz (Vice President, Human Resources) and Dr. Robert Carter, and Relator also emailed a report to Robert Donaldson (former Risk Manager), Carol Calabrese (Infection Control Nurse), and Teresa Wiseman (Director of Quality) on June 30, 2014. These individuals are all employees or agents of HCA and Centerpoint.

177.    Rizzi then submitted a claim to Medicare for reimbursement for the amputation performed in this non-sterile exam room, and without prior notification to the patient, and without the patient's required consent, in violation of federal regulations and Medicare billing rules.

178.    Submission of a claim for such reimbursement constitutes a violation of the false claims act under 31 U.S.C. 3729(a)(1)(A).

179.    On or about June 19, 2014, Rizzi did not wear gloves while debriding a new patient and the patient was bleeding, creating a high risk of infection to the patient. Relator reported this incident to the HCA medical director.

**Unlawfully billing for services in violation of the 90-day Global Rule**

180.    Rizzi also committed fraud by billing for services within the 90-day global rule following a surgery.

181.    Under the 90-day global rule, a physician cannot charge for any routine follow-up care related to a procedure as it is included in the allowable charges for the procedure. Physicians cannot charge for post-operation services that are part of the normal care following a surgery.

182.    Rizzi operated on Patient AL in January 2017, and then instructed the patient to come to the AWWC for follow up care despite the fact that AL had never been a patient of AWWC for previous wound care.

183.    Rizzi routinely charged for post-operation care within the 90-day global period which was apparently done for the purpose of allowing him to bill extra for services that should have been covered under the 90-day global rule.

184.    Rizzi would perform suture-less closings at the end of surgery with simply bandages and dressings. Then Rizzi would then bill for the suturing in follow-up exam in the clinic.

185.    Rizzi would wrongly charge additional Evaluation & Management charges for each post-operative clinic visit within the 90-day period.

186.    Rizzi also falsely charges patients for patient visits within the 90-day global period. The patients are getting charged by the hospital as well. Typically, a patient would follow up with a surgeon in the surgeon's private office and there would not be a service charge for dressing changes, TCCs, etc., within 90 days of surgery. In Dr. Rizzi's case, he has his patients follow up in the AWCC.

187.    On February 6, 2012, Relator had a conversation with Rizzi regarding him bringing patients to the AWCC who fell under the 90-day global. Rizzi improperly billed patients for services he provided at the AWCC and sis not provide the post-operative surgical care follow-up at his private office.

## Conspiracy in violation of 31 U.S.C. 3729(a)(1)(C)

188.    In September/October 2016, HCA Centerpoint Director, Gabe Clements told Relator not to challenge Rizzi's billing and that, even as the AWCC director, she was no longer to address Rizzi about what he could or could not bill for.

189.    HCA billed for services not supported by proper medical records as Rizzi did not complete his dictation for many patients for whom the hospital billed Medicare or Medicaid.

33

190. HCA continued this practice even after Relator brought it to the attention of HCA and Centerpoint, including through Relator's emails to Regina Bays in October 2016.

191. In the fall of 2016, Dr. Rizzi had AWCC staff invite some of his previous patients from the wound center who took a long time to heal to a dinner at the Hereford House. This was not the first time Dr. Rizzi had taken patients to dinner. Gabe Clements from HCA was also in attendance at this dinner.

192. On information and belief, Rizzi has committed these same violations with patients at his other practice locations, including Lee's Summit Medical Center in Lee's Summit, Missouri and Overland Park Regional Medical Center in Overland Park, Kansas, both of which are part of the nine hospitals comprising Defendant HCA Midwest and owned by Defendant HCA.

193. The actions, representations, omissions, and claims for payment of the defendants, as set forth herein, are material in that they impact the Federal Government's likely or actual payment decisions and behaviors with respect to Medicaid and Medicare funds.

194. For example, in at least one past audit of a podiatrist performed by the Office of Inspector General, Department of Health and Human Services, the podiatrist's actions in upcoding services, performing medically unnecessary services, submitting claims for undocumented services, and failing to produce or maintain records of billed services, resulted in overpayments to the provider—payments which would not have occurred had these false, fraudulent and/or inadequate activities been known to the Government payor. U.S. Dept. of Health and Human Services, Office of Inspector General. Audit of Medicare Part B Payments to a Southern California Podiatrist for the period June 1, 1992 through May 31, 1997; CIN: A-09-97-00078, Jan. 1999.

## COUNT I
## Billing Medicaid and Medicare for services that were not provided

195.     Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

196.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

197.     The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

198.     The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

199.     The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

200.     As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)     In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil

35

penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)     In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action

(e)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT II
## Upcoding—Billing for a Higher Level of Care Than Was Provided

201.    Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

202.    The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

203.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

204.    The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

36

205.    The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

206.    As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)    In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)    In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)    In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)    For all costs of the Federal FCA civil action

(e)    In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

**COUNT III**
**Billing for procedures provided without required informed consent**
**in violation of Federal law**

207.    Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

208.    The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

209.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

210.    The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

211.    The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

212.    As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

38

(a)    In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)    In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)    In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)    For all costs of the Federal FCA civil action;

(e)    In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT IV
### Billing for surgical procedures performed in non-compliant settings in violation of Federal law

213.    Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

214.    The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

215.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

39

216. The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

217. The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

218. As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a) In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b) In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action;

(e) In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT V
## Improper and Double billing for procedures

219.     Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

220.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

221.     The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

222.     The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

223.     The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

224.     As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)      In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil

41

penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each

false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation

Adjustment Act Improvements Act of 2015;

(b)     In favor of the United States against the Defendant for disgorgement of the profits

earned by Defendants as a result of its unlawful conduct;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C.

3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action;

(e)     In favor of the Relator and the United States for such other and further relief as

this Court deems to be just and equitable.

## COUNT VI
### Billing for services without required documentation

225.     Relator restates and realleges the above allegations as if each were stated herein in

their entirety and said allegations are incorporated herein by reference.

226.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A)

knowingly presenting, or causing to be presented to the United States Government, false claims

for payment.

227.     The Defendants knowingly presented or caused to be presented false or fraudulent

claims for payment or approval under the Medicaid and/or Medicare program, in violation of the

False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred

or owed.

228.     The Defendants directed, participated in, or authorized others to take the actions

set forth above, on behalf of Defendants, during the time period set forth herein.

229.    The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

230.    As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)    In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)    In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)    In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)    For all costs of the Federal FCA civil action;

(e)    In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

43

## COUNT VII
## Unlawfully billing for services in violation of the 90 day Global Rule

231.    Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

232.    The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

233.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

234.    The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

235.    The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

236.    As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)    In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil

44

penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)     In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action;

(e)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT VIII
### Billing for Medically Unnecessary or Worthless Surgery

237.     Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

238.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

239.     The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

240.     The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

45

241. The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

242. As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a) In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b) In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action;

(e) In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

46

**COUNT IX**
**Billing for procedures for which the Dr. lacked required licensing or credentials**

243.     Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

244.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (A) knowingly presenting, or causing to be presented to the United States Government, false claims for payment.

245.     The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by billing the program for costs not actually incurred or owed.

246.     The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period set forth herein.

247.     The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

248.     As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)     In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil

47

penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)     In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action:

(e)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

## COUNT X
### False implied certifications with material terms of the Medicare Provider Enrollment Agreement (CMS Form 855i) allowing Rizzi to unlawfully bill Medicare each year since 2012 when he was ineligible to bill Medicare as a matter of law

249.     Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

250.     The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (B) knowingly making, using or causing to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

251.     The Defendants knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the government.

252.     The Defendants then presented or caused to be presented false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by overbilling the program for costs not actually for which Defendants were not eligible for payment from Medicare or Medicaid between the years of 2012 and the present.

48

253.     The Defendants directed, participated in, or authorized others to take the actions set forth above, on behalf of Defendants, during the time period from 2011 through at least 2017.

254.     The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

255.     As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(A) and (a)(1)(B), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a)     In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b)     In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d)     For all costs of the Federal FCA civil action

(e)     In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

**COUNT XI**
**Conspiracy in violation of 31 U.S.C. 3729(a)(1)(C)**

256.    Relator restates and realleges the above allegations as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

257.    The False Claims Act, 31 U.S.C. 3729(a)(1), prohibits persons from (C) conspiring to commit a violation of 31 U.S.C. 3729(a)(1)(A), (B), (D), (E), (F) or (G).

258.    The Defendants knowingly conspired to commit violations of 31 U.S.C. 3729(a)(1)(A). presented or caused to be presented false or fraudulent claims for payment or approval under the Medicaid and/or Medicare program, in violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(A) by overbilling the program for costs not actually incurred or owed during the time period from at least 2012 through the present.

259.    The United States has been damaged as a result of Defendants' violations of the False Claims Act because it paid for certain overpayments and ineligible payments.

260.    As set for in the preceding paragraphs, Defendants have knowingly, with deliberate ignorance, or with reckless disregard for the truth, violated 31 U.S.C. 3729(a)(1)(C), and have thereby damaged the United States Government by their actions in an amount to be determined at trial.

WHEREFORE, Relator, acting on behalf of and in the name of the United States of America, and on her own behalf, demands and prays that judgment be entered as follows against Defendants under the Federal FCA Counts as follows:

(a) In favor of the United States against the Defendants for treble the amount of damages to Medicaid and Medicare from the false claims submitted, plus maximum civil penalties of Twenty-one Thousand Five-Hundred and Sixty-three Dollars ($21,563) for each false

50

claim, pursuant to 31 U.S.C. 3729(a)(1) and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

(b) In favor of the United States against the Defendant for disgorgement of the profits earned by Defendants as a result of its unlawful conduct;

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. 3730(d) to include all reasonable expenses, attorney fees and costs incurred by Relator;

(d) For all costs of the Federal FCA civil action

(e) In favor of the Relator and the United States for such other and further relief as this Court deems to be just and equitable.

**Plaintiff/Relator demands trial by jury as to all issues to triable.**

Respectfully submitted,

*/s/ Robert K. Collins*
Robert K. Collins
W.D. of Missouri Federal Bar #KS-000882
Collins Law Office, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*/s/ Sarah A. Brown*
Sarah A. Brown, MO# 37513
Brown and Curry, LLC
406 West 34th Street, Suite 810
Kansas City, Missouri 64111
(816) 756-5458
sarah@brownandcurry.com

*/s/ Anthony E. LaCroix*
Anthony E. LaCroix, MO # 60793
LaCroix Law Firm, LLC
406 West 34th Street, Suite 810
Kansas City, Missouri 64111
(816) 399-4380
tony@lacroixlawkc.com

51